Noe LARA a/k/a Noe R.
Lara, Appellant,

v.

The STATE of Texas, Appellee.

No. 13–89–275–CR.

Court of Appeals of Texas,
Corpus Christi.

Nov. 29, 1990.

Rehearing Overruled Dec. 13, 1990.

Discretionary Review Refused
March 20, 1991.

Joseph A. Connors, III, McAllen, for appellant.

Rene Guerra, Edinburg, for appellee.

Before NYE, C.J., and SEERDEN and KEYS, JJ.

## OPINION

NYE, Chief Justice.

A jury found appellant, Noe Lara, guilty of involuntary manslaughter, found that he used a deadly weapon during the offense and assessed punishment as five years' confinement in the Texas Department of Criminal Justice, Institutional Division, probated for five years. By two points of error, appellant asserts that the trial court erred by denying appellant's pre-trial motion to halt felony prosecution and his post-trial motion to set aside the felony conviction. We affirm the trial court's judgment.

The facts in this case are not at issue in this appeal, only the interpretation of the relevant Texas Penal Code sections, discussed in detail below. While off duty on the evening of May 27, 1987, appellant, a law enforcement officer with the McAllen Police Department, went to a bar to play a few games of pool and have a few drinks with his friend, Arnoldo Ruiz. While at the bar, friend Art Casas joined appellant and Ruiz. At approximately 2 a.m. that morning, the three men went to appellant's apartment where they watched television and drank beer. Thereafter, friend Andres Pena arrived for a visit. Pena and Ruiz played a friendly game of chess with appellant coaching Pena on his strategy. Ruiz won the game. He then reminded appellant that appellant now owed Ruiz thirty dollars from their wager on the game.

Appellant left the living room area where the chess game was played and entered his bedroom. The bedroom was dark and appellant did not turn on a light. He removed his service revolver from its holster, opened the cylinder and ejected the bullets onto the bedspread. He did not count the bullets on the bed although he worked the ejector mechanism several times before closing the cylinder. With gun in hand, appellant returned to his guests in the living room.

Appellant approached Ruiz and asked him to repeat how much money appellant owed from the wager. Ruiz answered, "Thirty one, but make it an even thirty." Appellant testified that he then intended to take the gun back to the bedroom, but Ruiz asked to examine the gun. Appellant handed the gun to Ruiz, who examined it and handed it to Casas, who handed it back to appellant.

Appellant, gun in hand, then proceeded towards the bedroom to leave the revolver on the bed. He was "dry firing" the weapon as he went.[1] At the same time Ruiz, who had moved to the kitchen, walked out of the kitchen and stepped in front of appellant. When appellant stepped away, Ruiz said appellant's name twice and collapsed, having sustained a bullet wound to

---

1. Apparently a term for pulling the trigger of an  unloaded firearm.

the chest. He died before the ambulance arrived.

A professional forensic firearms examiner testified that he tested appellant's service revolver by unloading the cylinder and closing in the manner in which appellant testified he had done. In three of the six or seven trials in which the examiner attempted to "unchamber" all of the ammunition, some of the bullets did not eject from the cylinder. He stated that it was quite possible that a person failing to examine the cylinder while unloading the chambers would not know that a live round remained in the gun. He also stated that a person hurriedly unloading the gun in a darkened room made an incomplete unchambering all the more probable. The examiner opined that a person with approximately ten or eleven years experience in law enforcement and with weapons use and safety qualifications testing who, while in a darkened room, attempted to unload his own gun in a manner in which he had not been trained during those ten or eleven years, who then approached the victim while "dry firing" that gun and the gun discharged, killing the victim, acted in a reckless manner.

■ By his first point of error, appellant asserts that the trial court erred by failing to grant his pre-trial motion to halt felony prosecution because the legislature's attempt to distinguish between the culpable mental states of "recklessness," a felony, and "criminal negligence," a misdemeanor, "constitutes a distinction without a sufficiently pragmatic difference" and furthermore, basing a felony conviction, rather than a misdemeanor, "upon the shifting sands of these semantics" does not constitute substantial justice. Hence, appellant asserts that Tex.Penal Code Ann. § 19.05(a)(1) (Vernon 1989)[2] is unconstitutional as applied to this case and that appellant's conviction under § 19.05(a)(1) is unconstitutional under the "due course of law" provision of the Texas Constitution and the Due Process and Equal Protection

clauses of the United States Constitution. Appellant's second point of error asserts that for the reasoning stated above, the trial court erred by failing to grant appellant's post-trial motion to halt appellant's prosecution and conviction for a felony offense.

Appellant relies upon the holdings in *People v. Calvaresi,* 188 Colo. 277, 534 P.2d 316 (1975) and *People v. Webb,* 189 Colo. 400, 542 P.2d 77 (1975) to support his argument. In *Calvaresi,* the defendant was charged with manslaughter. The manslaughter statute provided that a person committed this felony offense if that person **recklessly** caused the death of another. The defendant argued that the portion of the manslaughter statute under which he was convicted was unconstitutional in that the culpable mental state required to sustain a conviction for manslaughter was indistinguishable from that required for criminally negligent homicide.

The Colorado Supreme Court examined the definitions of "recklessly" and "criminal negligence" contained in the Colorado penal statutes and found that the Colorado legislature's attempt to distinguish between the two offenses "constitutes a distinction without a sufficiently pragmatic difference." The statutes defined "recklessly" as "the failure to perceive a risk, of which a person knew or reasonably should have been aware and the willful and wanton disregard of that standard of conduct a reasonable person would observe in a given situation." The statutes defined "criminal negligence" as "the failure to perceive a substantial and unjustifiable risk and such failure constitutes a gross deviation from the standard of care that a reasonable person would observe in a given situation." The court stated that the distinction between a gross deviation from and a wanton and willful disregard of, a standard of care was not sufficiently apparent to be intelligently and uniformly applied. Thus, basing a felony conviction rather than a misde-

---

2. **§ 19.05. Involuntary Manslaughter**
    (a) A person commits an offense if he:
    (1) recklessly causes the death of an individual....

(3) An offense under this section is a felony of the third degree.

meanor conviction "upon the shifting sands of these semantics does not constitute substantial justice." In *Webb*, the court used its analysis in *Calvaresi* to again declare unconstitutional the application of the two culpable mental state definitions.[3]

Criminally negligent homicide is a lesser included offense of involuntary manslaughter. *Moore v. State*, 574 S.W.2d 122, 124 (Tex.Crim.App.1978). The difference between the two offenses as defined in the Texas Penal Code is the culpable mental state required to establish each offense—criminal negligence for the former and recklessness for the latter. *Thomas v. State*, 699 S.W.2d 845, 849 (Tex.Crim.App. 1985); *Lewis v. State*, 529 S.W.2d 550, 553 (Tex.Crim.App.1975); *see also Gaona v. State*, 733 S.W.2d 611, 614–15 (Tex.App.— Corpus Christi 1987, pet. ref'd). The specific intent to kill is not an element of involuntary manslaughter. *Gaona*, 733 S.W.2d at 615.

A comparison of the culpable mental states studied in *Calvaresi* and *Webb* with those defined in Texas Penal Code Ann. § 6.03(c), (d) (Vernon 1974) shows that appellant's assertions are without merit. By Colorado definitions, the different negligence standards actually overlapped and a person could fail to become aware of or to perceive a risk and yet be guilty of a felony.

In contrast, Section 6.03(c) of the Texas Penal Code states that a person is reckless or acts recklessly when he **is aware of but consciously disregards a substantial and unjustifiable risk** that the circumstances exist or the result will occur.[4] This section involves conscious risk creation, that is, the actor is aware of the risk surrounding his conduct or the results thereof, but consciously disregards that risk. *Lewis*, 529 S.W.2d at 553. Section 6.03(d) states that a person acts with criminal negligence, or is criminally negligent, . . . when he **ought to be aware of a substantial and unjustifiable risk** that the circumstances exist or the result will occur.[5] This section involves inattentive risk creation, that is, the actor ought to be aware of the risk surrounding his conduct or the results thereof. *Lewis*, 529 S.W.2d at 553. Thus, for recklessness the actor perceives a substantial risk but then consciously disregards it; conversely, for criminal negligence the actor failed to perceive the substantial risk before the offense occurred. *Moore*, 574 S.W.2d at 123; *Lewis*, 529 S.W.2d at 553; *Smith v. State*, 721 S.W.2d 524, 526 (Tex.App.—Corpus Christi 1986, no pet.).

We conclude that sections 6.03(c) and 6.03(d) do not define the same culpable mental states, nor does one definition include any portion of the other. Furthermore, Tex.Penal Code Ann. §§ 19.05(a)(1), 19.07 (Vernon 1989) do not penalize the same conduct. Appellant's first and second points of error are overruled.

The trial court's judgment is AFFIRMED.

---

**3.** We note that the Colorado legislature subsequently amended the relevant sections of the Colorado penal statutes to avoid future confusion and to pass constitutional muster.

**4.** The risk must be of such a nature and degree that **its disregard** constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

**5.** The risk must be of such a nature and degree that the **failure to perceive** it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.