Filed 6/14/22  P. v. Torres CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>HECTOR JOSE TORRES,<br><br>Defendant and Appellant. | F081272<br><br>(Super. Ct. No. F17903313)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING**<br>[No Change in Judgment] |

**THE COURT:**

It is ordered that the opinion filed herein on May 23, 2022, be modified as follows:

On page 14, the third sentence of the first full paragraph is modified to read as follows:

> Importantly, no expert testified that the cause of Singh's death was a heart attack unrelated to the accident, which was defendant's theory of the case.

Except for the modification set forth, the opinion previously filed remains unchanged.  There is no change in the judgment.

Appellant's petition for rehearing is denied.

                                                                    PEÑA, J.

WE CONCUR:


FRANSON, Acting P. J.


SMITH, J.

Filed 5/23/22  P. v. Torres CA5 (unmodified opinion)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>HECTOR JOSE TORRES,<br><br>  Defendant and Appellant. | F081272<br><br>(Super. Ct. No. F017903313)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Gary R. Orozco, Judge.

Jill M. Klein, under appointment by the Court of Appeal, for Defendant and Appellant.

Matthew Rodriquez, Acting Attorney General, Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Ross K. Naughton, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Defendant Hector Jose Torres was driving while under the influence of alcohol when he made an unsafe and illegal U-turn in front of a vehicle driven by Faqir Singh

Kang (Singh), causing a motor vehicle accident. Singh initially appeared fine, but after arriving at the hospital he suddenly stopped breathing and was unable to be resuscitated. A jury convicted defendant of second degree murder (Pen. Code, § 187, subd. (a); count 1), felony driving under the influence (Veh. Code, § 23152, subd. (a); count 2), and felony driving with a blood-alcohol content of 0.08 percent or higher (Veh. Code, § 23152, subd. (b); count 3). The jury also found true allegations defendant suffered three prior convictions related to driving under the influence within 10 years of the charged offense (Veh. Code, § 23550).[1] The trial court imposed a 15-years-to-life term for count 1 and a concurrent term of two years for count 2; a term of two years was imposed and stayed for count 3. Defendant filed a timely appeal.

On appeal, defendant first argues the trial court prejudicially erred when it instructed the jury on negligence of medical staff under CALCRIM No. 620. Defendant next contends the trial court should have stayed imposition of sentence on count 2 pursuant to Penal Code section 654. (Undesignated statutory references are to the Penal Code.) The People agree the court erred when it imposed a concurrent sentence on count 2 and that punishment for count 2 should be stayed. In his supplemental opening brief, defendant further contends the matter should be remanded to the trial court for it to determine whether to exercise its sentencing discretion under recently amended section 654. The People agree defendant is entitled to the benefits of the recent changes to section 654.

We agree the trial court erred by failing to stay defendant's sentence on count 2, and the matter should be remanded to the trial court for it to determine whether to exercise its discretion under section 654, as amended. Otherwise, the judgment is affirmed on all other grounds.

---

[1]On March 11, 2020, defendant pleaded no contest to count 4, driving on a suspended license (Veh. Code, § 14601.2, subd. (a)). On May 18, 2020, defendant received credit for time served for count 4.

2.

# FACTUAL BACKGROUND

Defendant attempted to make an unlawful U-turn across double yellow lines from the right-hand shoulder in front of Singh, causing a motor vehicle accident at approximately 10:30 p.m. A distinct odor of alcohol was coming from defendant; his eyes were red and watery, and his speech was thick and slurred. A preliminary alcohol screening test was administered, and defendant's blood alcohol was 0.134 percent at 11:03 p.m. He was placed under arrest for driving while under the influence and causing injury to another. A subsequent blood test collected at 12:50 a.m. showed defendant's blood sample contained 0.142 percent alcohol.

Singh, who was 79 years old, initially appeared to be fine and in good health after the accident. Although Singh had some blood on his face, which appeared to be from a bloody nose, he was talking and able to stand and walk around. Singh said his head hurt a little bit; he complained of some chest pain and had a red mark on his chest that appeared to be from the seatbelt. However, Singh did not exhibit any signs of shock and his vital signs were normal, including his skin, blood pressure, heart rate, respiratory rate, lung sounds, and mental status. His chest and lungs were clear and he did not have difficulty breathing. Singh did not complain of pain or tenderness upon palpation of his body, including to his rib cage and abdomen.

Singh initially refused to go to the hospital, but eventually agreed based on the strong recommendation of medical personnel at the scene who considered the severity of the collision. There were no changes in Singh's mental status or physical condition while he was being transported to the hospital, nor upon his initial arrival at the hospital. However, after about five to 10 minutes at the hospital, Singh's condition suddenly changed. He started gasping for breath, he became cyanotic, unconscious, and nonresponsive to questions. His heart rate went from normal to arrhythmic. The hospital medical staff took over and began performing cardiopulmonary resuscitation (CPR) on Singh. CPR was performed hard and vigorously, using stiff arms at about five inches

3.

down from Singh's neckline. Medical personnel were unable to resuscitate Singh and he was confirmed deceased at 12:10 a.m. Those who were at the scene of the motor vehicle accident were surprised to learn Singh had died. Singh was described as being the walking wounded, where it was not apparent there was something wrong.

Dr. Michael Chambliss was the forensic pathologist who performed the autopsy on Singh. Based on the external and internal injuries, Dr. Chambliss concluded Singh's cause of death to be chest and abdominal injuries and internal bleeding due to blunt impact from the motor vehicle accident.

## DISCUSSION

## I. Medical Negligence Instruction in CALCRIM No. 620

Defendant first argues the court prejudicially erred by instructing the jury regarding medical negligence in CALCRIM No. 620, which he contends was factually unsupported, inconsistent with the defense theory of the case, and could have only served to confuse the jury. Defendant contends there was no evidence that any medical negligence caused or contributed to the victim's fatal injuries. Defendant contends the instruction allowed the jury to find him guilty based on a factually unsupported theory of causation, violating his state and federal constitutional rights. While we agree there was no evidence medical negligence caused or contributed to Singh's death to support the instruction, we find the instructional error harmless.

### A. Relevant Factual Background

Dr. Chambliss noted it was common to see bruising on the face, nose, and chest area in motor vehicle accidents. He noticed a three-inch bruise covering Singh's nose and dried blood beneath his nostrils, which is consistent with the deployment of the airbag in the victim's vehicle. There was a bruise and an abrasion on top of Singh's left shoulder, consistent with a seatbelt injury; and an injury on the front of his left hip that could be associated with the lap portion of the seatbelt. An external exam also revealed a

4.

circular bruise above the breast line in the chest region, to the right of the sternum, that was over eight inches wide. This injury was determined to be consistent with CPR.

An internal examination revealed the victim had multiple rib fractures under the upper right chest area, starting from below the clavicle and extending down to about the fourth rib on the upper anterior right side. There were also a few rib fractures to the anterior left rib cage, which were on the upper first through third ribs. There was a separation of the muscles between the fourth and fifth ribs on the right chest wall laterally. In the upper right chest area, where the clavicle meets the neck area and the sternum, there was a noticeable area of bleeding in the large veins that go back to the right side of the heart. These major veins were determined to be the source of about 700 milliliters of blood that had pooled in the right chest cavity. The pooling of blood changed the pressure in the cavity and caused the right lung to collapse. There was bruising on the surface of the right lung, which Dr. Chambliss determined was from the blunt trauma of the motor vehicle accident. There was also a bruise on the right front heart involving the right ventricle and septum, a few bruises present in the right chest cavity, and a few bruises to the right lung.

The emergency room doctor, Dr. Aaron Carter, testified that CPR is performed at about five to six inches down from the neckline. In order to perform CPR, one must push down very hard and fast, using upper body weight and stiff arms. It is common for ribs to break while performing CPR, especially in older patients. CPR can cause rib fractures and bruising over the sternum or chest region. Dr. Chambliss noted that CPR causes rib fractures in the front of the chest wall, from about the third rib down to the seventh or eighth rib. Rib fractures can occur higher up if CPR is improperly performed higher. External and internal injuries from CPR can also vary based on the length of time of the resuscitation process; the shorter the time frame, the less external and internal injuries. Given that CPR was performed on the victim at five inches below the neckline, which was consistent with the bruise located by the sternum, Singh's rib injuries were deemed

5.

inconsistent with CPR. Therefore, Dr. Chambliss determined that Singh's rib injuries were more attributed to the motor vehicle accident than CPR.

Singh's other internal injuries were also attributed to blunt force trauma from the motor vehicle accident. The inverted "V" shaped bruise on his right side and the separation of muscles between the fourth and fifth ribs on the right side were considered blunt trauma injuries consistent with a motor vehicle accident and not resuscitation. Additionally, a tear on the left lobe of the liver was deemed a deceleration-type injury associated with sudden stops in motor vehicle accidents.

Although Dr. Chambliss, when conducting the autopsy, was unaware the victim did not receive CPR until after he arrived at the hospital, this fact did not change his opinion on the cause of death. Dr. Chambliss knew Singh was initially doing well at the scene of the accident and then suddenly collapsed. Given Singh's injuries, it was possible for him to have been able to walk around and interact with others for approximately 20 to 30 minutes. Blunt trauma to the chest can give unusual presentations and an individual can still die. Dr. Chambliss testified that he had seen this in at least five cases in the last couple of years.

Dr. Carter noted the cause of death was cardiac arrest, but explained it was a general term for the heart stopping, whatever the cause, and did not mean Singh had a heart attack. Dr. Carter explained his team worked on the victim for about 30 minutes, which included performing CPR on Singh from between 15 to 30 minutes. Dr. Carter could not say what caused the cardiac arrest, indicating a pathologist is more qualified to determine the cause of death in this particular case since a pathologist has the ability to look internally and see things he could not see. Dr. Chambliss stated Singh did not have a heart attack. He determined Singh's cause of death to be chest and abdominal injuries due to blunt impact from the motor vehicle accident.

The People asked the court to include the optional medical negligence language in CALCRIM No. 620 when it instructed the jury. Based upon the testimony elicited at

6.

trial, the People believed one of the defense's theories was that the hospital staff's efforts to resuscitate Singh either exacerbated his injuries or were a factor in causing his death.

Defense counsel never formally objected to the inclusion of the medical negligence language in CALCRIM No. 620. Rather, defense counsel questioned the basis for the additional instruction, arguing there was no evidence of improper medical treatment, and he stated he did not intend to argue CPR contributed to the victim's death. Ultimately, defense counsel appeared to agree there could be a basis for the medical negligence instruction, stating, "Counsel's right. I guess I could … I guess it could be argued …." The trial court chose to give the medical negligence instruction, concluding each party had asked questions on the "edges," neither doctor ruled out CPR as the cause of some of the injuries, and it was possible one or more jurors could come up with the theory that CPR was performed too hard on the 79-year-old man, or at least "it contributed in part."

CALCRIM No. 620 was read to the jury as follows (the challenged portion is italicized):

> "There may be more than one cause of death. An act causes death only if it is a substantial factor in causing the death. A *substantial factor* is more than a trivial or remote factor. However, it does not need to be the only factor that causes the death.
>
> "*The failure of the doctors or medical staff to use reasonable care in treating [Singh] may have contributed to the death. But if the injury inflicted by the defendant was a substantial factor causing the death*, then the defendant is legally responsible for the death even though the doctors or medical staff may have failed to use reasonable care. On the other hand, if the injury inflicted by the defendant was not a substantial factor causing the death, but the death was caused by grossly improper treatment by the doctors or medical staff, then the defendant is not legally responsible for the death.*
>
> "[Singh] may have suffered from an illness or physical condition that made him more likely to die from the injury than the average person. The fact that [Singh] may have been more physically vulnerable is not a defense to murder. If the defendant's act was a substantial factor causing

7.

the death, then the defendant is legally responsible for the death.  This is true even if [Singh] would have died in a short time as a result of other causes or if another person of average health would not have died as a result of the defendant's actions.

"If you have a reasonable doubt whether the defendant's act caused the death, you must find him not guilty."  (First italics in original, second italics added.)

In closing argument, defense counsel challenged the evidence the car accident caused Singh's death; he argued Singh's injuries documented in the autopsy could have been caused by CPR.  He argued "there's no … evidence that the injuries actually did occur prior to CPR except possibly the bruised lungs.  [W]e're gonna find that the evidence … is that the internal injuries were likely caused by CPR … after [Singh] had died or after he had collapsed and he was dying."  Defense counsel argued, "CPR can cause blood to get in the pericardial sac.  It can cause internal bleeding in the chest cavity.  … CPR, if it hits a vein, if you burst a vein, it starts to bleed and you continue to do CPR, it can increase the production of internal bleeding, can make it worse.  Although rare, the liver can be injured from CPR."  He asserted, because the evidence of the victim's liver laceration did not establish his liver bled, the injury to the liver likely did not occur at the crash site but rather when CPR was administered.  He suggested there was evidence Singh could have possibly had a heart attack.  He asserted he did not "think the evidence in this case, as far as the causation, was something that can prove that the accident itself was the cause of death."

The People countered in rebuttal: "Defense Counsel also went into … the causation, about the CPR, about the medical personnel.  But he essentially proved the People's case for us, because what [CALCRIM No.] 620 tells you is that medical intervention or preexisting conditions do not matter.  [Defendant] is still guilty regardless of what any medical personnel did or any preexisting conditions [Singh] had."

## B. Standard of Review

Instructional errors are questions of law, which we review de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218; *People v. Cole* (2004) 33 Cal.4th 1158, 1210.) We must ascertain the relevant law and determine whether the given instruction correctly stated it. (*People v. Kelly* (1992) 1 Cal.4th 495, 525–526; *People v. Warren* (1988) 45 Cal.3d 471, 487.)

"Trial courts have the duty to screen out invalid theories of conviction, either by appropriate instruction or by not presenting them to the jury in the first place." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1131.) Therefore, a trial court should only give a requested jury instruction if it is supported by substantial evidence. (*People v. Marshall* (1997) 15 Cal.4th 1, 39; *People v. Williams* (1992) 4 Cal.4th 354, 361; *People v. Flannel* (1979) 25 Cal.3d 668, 685 [it is error to instruct on a theory that is entirely unsupported by the evidence], superseded by statute on other grounds as stated in *People v. Elmore* (2014) 59 Cal.4th 121, 138; *People v. Burnett* (1991) 9 Cal.App.4th 685, 690; *People v. Derello* (1989) 211 Cal.App.3d 414, 426.)

In determining whether an instructional error prejudiced the defendant, the entire record should be examined, including the facts and the instructions, the arguments of counsel, any communications from the jury during deliberations, and the entire verdict. (*People v. Guiton*, *supra*, 4 Cal.4th at p. 1130; see *People v. Hayes* (1990) 52 Cal.3d 577, 642 [the entire record is examined to determine whether the instructions may have misled the jury to defendant's detriment].) The challenged instruction is viewed "in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner." (*People v. Houston* (2012) 54 Cal.4th 1186, 1229.) "'[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation.' [Citation.] … 'A single instruction is not viewed in isolation, and the ultimate decision on whether a specific jury instruction is correct and adequate is determined by

9.

consideration of the entire instructions given to the jury.'" (*People v. Covarrubias* (2016) 1 Cal.5th 838, 906; accord, *People v. Williams* (2013) 56 Cal.4th 630, 688.) Corrective instructions given to a jury may be considered in assessing the prejudicial effect of an improper instruction. (*People v. Saddler* (1979) 24 Cal.3d 671, 684.)

### C. Applicable Law

"If a person inflicts a dangerous wound on another, it is ordinarily no defense that inadequate medical treatment contributed to the victim's death." (*People v. Roberts* (1992) 2 Cal.4th 271, 312; accord, *People v. McGee* (1947) 31 Cal.2d 229, 240; *People v. Dilworth* (1969) 274 Cal.App.2d 27, 33.) However, "when medical treatment is grossly improper, it may discharge liability for homicide if the maltreatment is the sole cause of death and hence an unforeseeable intervening cause." (*Roberts*, *supra*, at p. 312; see *McGee*, *supra*, at p. 240; see also *People v. Calvaresi* (1975) 188 Colo. 277 [534 P.2d 316, 319]; *State v. Jacobs* (1984) 194 Conn. 119 [479 A.2d 226, 230]; Annot., Homicide: Liability Where Death Immediately Results from Treatment or Mistreatment of Injury Inflicted by Defendant (2021) 50 A.L.R.5th 467.)

### D. Analysis

Defendant argues the medical negligence instruction was factually unsupported, inconsistent with the defense theory of the case, and could have only served to confuse the jury. He asserts the instruction was prejudicial because it "focused the jury on an irrelevant theory of causation and detracted it from fully considering the defense theory that [Singh] simply had a heart attack." Defendant claims "instructing the jury on medical negligence, untethered to any actual evidence of improper treatment or to any theory of causation proffered by the People or the defense, could only serve to confuse the jury and mislead it into believing that medical negligence was at issue." He also argues the instruction focused the jury on an irrelevant theory of causation and detracted it from fully considering the defense theory that Singh had a heart attack. He contends the error resulted in a deprivation of his Fourteenth Amendment due process rights. The

People contend there was evidence that could have led some jurors to think CPR could have been applied with too much force such that it was "not done properly." They assert, accordingly, the court properly instructed the jurors excessive CPR would not constitute a failure to show causation unless it was so "grossly improper" that the motor vehicle accident could not be deemed "a substantial factor" in causing Singh's death.

Initially, we note defense counsel never formally objected to the challenged portion of the instruction as he contends; instead, he agreed the evidence could support the instruction, waiving his claim of error.[2] (See *People v. Bolin* (1998) 18 Cal.4th 297, 326 [defense counsel waived claim of error by agreeing evidence supported the instruction].) However, even if the issue was sufficiently preserved for our review, as discussed further *post*, we cannot conclude defendant was prejudiced by the challenged portion of CALCRIM No. 620.

It is true that it is error to give an instruction which correctly states a principle of law but has no application to the facts of the case. (*People v. Guiton*, *supra*, 4 Cal.4th at p. 1129; *People v. Anderson* (1965) 63 Cal.2d 351, 360; *People v. Eggers* (1947) 30 Cal.2d 676, 687.) Upon review of the record, we find the record devoid of any evidence demonstrating medical staff failed to use reasonable care or that Singh received inadequate medical treatment. While the record shows some of Singh's external and internal injuries could have been caused, at least in part, by CPR, there was no evidence CPR was improperly or unreasonably performed. The evidence reflected CPR was appropriately performed at about five inches below the neckline, which was confirmed by a circular bruise at the sternum attributed to CPR. While the evidence shows the extent of injuries from CPR can differ depending on the age of the patient and the duration of the CPR, there was no testimony that CPR for approximately 30 minutes on a 79-year-old

---

[2]Notably, "[t]he appellate court may … review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." (§ 1259.) For the reasons discussed further *post*, we cannot conclude the challenged instruction affected defendant's substantial rights.

11.

man was improper or excessive. Thus, the jury would have had to speculate, based on evidence it did not have, to conclude negligence by medical personnel was an intervening cause of the victim's death. Because the challenged portion of CALCRIM No. 620 did not apply to the facts of the case, it was error to give it. Accordingly, here, the trial court erred when it instructed the jury with the additional medical negligence language in CALCRIM No. 620. (See *People v. Roberts*, *supra*, 2 Cal.4th at pp. 312–313 [court properly refused to instruct jury defendant was not liable for killing if victim received inadequate medical care that was sole cause of death where "record [was] devoid of any evidence of grossly improper treatment," noting "[t]he jury need not be instructed on a theory for which no evidence has been presented"]; *People v. Stanley* (2006) 39 Cal.4th 913, 946 [court did not err in refusing to instruct jury with pinpoint instruction on proximate cause where evidence established victim died from stab wounds inflicted by defendant rather than incompetent and inadequate medical care].)

However, contrary to defendant's contention, we cannot conclude the error was one of federal constitutional dimension. (See *People v. Guiton*, *supra*, 4 Cal.4th at pp. 1129–1130 [citing statement in *Griffin v. United States* (1991) 502 U.S. 46, 60 that "it would generally be preferable" to remove an unsupported theory from jury's consideration but failure to do so would not violate the federal Constitution].) Rather, the error here is one of state law subject to the traditional test under *People v. Watson* (1956) 46 Cal.2d 818, 836. (See *Guiton*, *supra*, at p. 1130; *People v. Ervin* (2000) 22 Cal.4th 48, 91 [errors regarding pinpoint instructions are reviewed under *Watson* harmless error].) Under *Watson*, we must determine whether defendant demonstrated a reasonable probability he would have obtained a more favorable result had the error not occurred. (*People v. Moore* (2011) 51 Cal.4th 1104, 1130; *People v. Brown* (1988) 46 Cal.3d 432, 446–447.)

Defendant fails to demonstrate prejudice. As read to the jury, the unchallenged portion of CALCRIM No. 620 explained there may be more than one cause of death and

that an act causes death only if it is a substantial factor in causing death, but it need not be the only factor that causes the death. The instruction then explained that the failure of medical staff to use reasonable care *may* have contributed to his death. The instruction does not tell the jury the medical staff contributed to Singh's death—only that it *may* have happened. The trial court reinforced the jury's factfinding role by instructing, "Some of these instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I'm suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them." We presume the jury understood and followed these instructions. (*People v. Silveria and Travis* (2020) 10 Cal.5th 195, 350–352; see *People v. Sandoval* (2015) 62 Cal.4th 394, 422; *People v. Pearson* (2013) 56 Cal.4th 393, 414.) Thus, to the extent the challenged instruction did not apply to the facts of the case, we presume the jury did not consider it. (See *People v. Frandsen* (2011) 196 Cal.App.4th 266, 278 ["appellant's assertion that no substantial evidence supported the instruction does not warrant our finding reversible error because the jury is presumed to disregard an instruction if the evidence does not support its application"].)

Moreover, the evidence does not show defendant would have obtained a more favorable outcome had the error not occurred. (See *People v. Moore*, *supra*, 51 Cal.4th at p. 1130; *People v. Brown*, *supra*, 46 Cal.3d at pp. 446–447; *People v. Breverman* (1998) 19 Cal.4th 142, 177, 178.) Under *Watson*, we consider not "what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration." (*Breverman*, *supra*, at p. 177.) "In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*Ibid.*)

Here, the evidence overwhelmingly shows that Singh died from blunt trauma caused by the motor vehicle accident. Even assuming the jury believed that some of the victim's injuries were caused by CPR, there was no evidence or argument Singh died as a result of CPR. Importantly, there was no expert testimony to support defendant's theory of the case—that Singh died of a heart attack, unrelated to the accident. Therefore, we cannot conclude it is reasonably probable defendant would have obtained a more favorable verdict if the court had not instructed the jury with the challenged portion of CALCRIM No. 620. Rather, the trial court's error in giving the medical negligence instruction in CALCRIM No. 620 was harmless.

## II.     Section 654 Prohibits Punishment for Both Count 1 and Count 2

Defendant next contends the trial court erred by imposing and executing sentences for both second degree murder and driving under the influence. The People concede the sentence for count 2 should have been stayed. However, in defendant's supplemental opening brief, he adds the matter should be remanded for the trial court to determine whether to exercise its new discretion under section 654, as amended by Assembly Bill No. 518 (Reg. Sess. 2021–2022) (Assembly Bill 518), to decide which sentence to stay. The People agree. We, too, agree the trial court erred by imposing and executing punishment on both count 1 and count 2, and the matter should be remanded to the trial court for it to exercise its newfound discretion under section 654, as amended.

### A.     Relevant Procedural History

On May 18, 2020, the trial court sentenced defendant to 15 years to life for count 1. The trial court noted counts 2 and 3 arose from the same course of conduct that led to count 1 and sentenced defendant to the middle term of two years for count 2, to run concurrently with the sentence on count 1. The court sentenced defendant to the middle term of two years on count 3 and stayed that sentence.

14.

**B      Standard of Review and Applicable Law**

"Section 654 precludes multiple punishments for a single act or indivisible course of conduct." (*People v. Hester* (2000) 22 Cal.4th 290, 294.) "[I]t is well settled that section 654 applies not only where there was but one act in the ordinary sense, but also where there was a course of conduct which violated more than one statute but nevertheless constituted an indivisible transaction." (*People v. Perez* (1979) 23 Cal.3d 545, 551; see *People v. Beamon* (1973) 8 Cal.3d 625, 637.) "'Whether a *course of criminal conduct* is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the *intent and objective of the actor*. If all the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.'" (*Beamon*, *supra*, at p. 637, quoting *Neal v. State of California* (1960) 55 Cal.2d 11, 19, disapproved on other grounds in *People v. Correa* (2012) 54 Cal.4th 331, 334; accord, *Perez*, *supra*, at p. 551.)

"Whether a defendant may be subjected to multiple punishment under section 654 requires a two-step inquiry." (*People v. Corpening* (2016) 2 Cal.5th 307, 311.) "At step one, courts examine the facts of the case to determine whether multiple convictions are based upon a single physical act. [Citation.] When those facts are undisputed—as they are here—the application of section 654 raises a question of law we review de novo." (*Ibid.*; accord, *People v. Harrison* (1989) 48 Cal.3d 321, 335 ["the applicability of [section 654] to conceded facts is a question of law"]; *People v. Valli* (2010) 187 Cal.App.4th 786, 794 ["We review de novo the legal question of whether section 654 applies"].)

Assembly Bill 518 became effective January 1, 2022, while defendant's appeal was pending. Under the previous version of section 654, it was required that an act or omission punishable in different ways by different laws be punished under the law providing the longest possible term of imprisonment. However, Assembly Bill 518 amended section 654 to provide that an act or omission punishable in different ways by

15.

different laws may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision. (See § 654, subd. (a), as amended by Stats. 2021, ch. 441, § 1.) As such, the trial court is no longer required to impose punishment for the crime carrying the longest term of imprisonment, but now has discretion in deciding which term of punishment to impose.

### C. Analysis

Initially, we note defendant failed to object to the court's failure to stay his sentence on count 2 at the time of sentencing. However, errors regarding section 654 may be corrected on appeal regardless of whether the issue was raised by objection in the trial court. (*People v. Perez, supra*, 23 Cal.3d at p. 549, fn. 3.)

Defendant contends, and the People concede, there was one criminal act that formed the basis for all of defendant's convictions in this case: defendant's driving under the influence of alcohol. Indeed, the record shows the trial court acknowledged counts 1, 2 and 3 arose from the same incident. We agree the single act of driving under the influence formed the basis for defendant's second degree murder conviction on count 1 and his conviction on count 2. Accordingly, we conclude the trial court erred in failing to stay the sentence on count 2 pursuant to section 654.

As amended, section 654 now provides an act or omission punishable in different ways by different laws may be punished under either of such provisions. (§ 654, subd. (a).) As such, the trial court is no longer required to impose punishment for the crime carrying the longest term of imprisonment, but now has discretion in deciding which term to impose as punishment.

In *In re Estrada* (1965) 63 Cal.2d 740, 748, the California Supreme Court held, where the amended statute mitigates punishment and there is no saving clause, the amendment will operate retroactively to all defendants whose judgments are not yet final on the amendment's operative date. (See *People v. Frahs* (2020) 9 Cal.5th 618, 627–628; *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 307–308; *People v. Brown* (2012)

16.

54 Cal.4th 314, 323; *People v. Francis* (1969) 71 Cal.2d 66, 75–76 [*Estrada* applies where a reduced punishment is possible].)  Assembly Bill 518, which no longer requires punishment under the longest possible term of imprisonment when multiple offenses are based on the same act or omission, reduces possible punishment and should apply retroactively to sentences that are not yet final.  (See, e.g., *People v. Mani* (2022) 74 Cal.App.5th 343, 379–380 [concluding Assem. Bill 518 applies retroactively].)

Here, defendant was sentenced on May 18, 2020, and his case was not final when Assembly Bill 518 became effective.  As such, he is entitled to the benefits of amended section 654.  Therefore, remand is necessary to permit the court to exercise its newfound discretion under the amended statute.  (See *People v. Mani*, *supra*, 74 Cal.App.5th at p. 381; cf. *People v. Navarro* (2007) 40 Cal.4th 668, 681.)

## DISPOSITION

The matter is remanded to the trial court for it to exercise its sentencing discretion under section 654, as amended.  In all other respects, the judgment is affirmed.


PEÑA, J.

WE CONCUR:


FRANSON, Acting P. J.


SMITH, J.


17.